United States District Court
Southern District of Texas
**ENTERED**
January 27, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LaDARYL DEWAYNE WADDLETON, | § | |
| TDCJ # 01201064, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 4:18-4015 |
| | § | |
| BRIAN COLLIER, *et al*., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LaDaryl Dewayne Waddleton is incarcerated in the Texas Department of Criminal Justice–Correctional Institutions Division (TDCJ). Plaintiff proceeds *pro se* and has paid the filing fee. He has filed a complaint (Dkt. 1) and several amendments (Dkt. 13, Dkt. 15, Dkt. 16) with leave of the Court (Dkt. 21). He also has filed a more definite statement (Dkt. 28). Defendants have filed a motion to dismiss (Dkt. 38) and Waddleton has responded (Dkt. 45). The motion is ripe for decision. Having considered the pleadings, the motion and response, the applicable authorities, and all matters of record, the Court will **GRANT** the motion to dismiss for the reasons explained below. Defendant's motion to seal and Plaintiff's motion to add supplemental exhibits will be **GRANTED**. All remaining motions will be **DENIED as moot**.

## I.   BACKGROUND

Waddleton alleges that officials at the Estelle Unit violated his rights in connection

with his inmate trust-fund account, his mail, and prison disciplinary cases.   He brings suit against six Defendants:   TDCJ Executive Director Bryan Collier; Assistant Warden Christopher LaCox; law library supervisor Jeania Pegoda; assistant mailroom supervisor Diana Tyler; Assistant Warden Tracy Hutto; and Sergeant Yazmin Galvan.[1]  With the exception of Collier, all Defendants were at the Estelle Unit at the times relevant to this lawsuit.

Most of Waddleton's claims pertain to the funds in his inmate trust-fund account. He states in his pleadings that he had a high balance in the account in 2018-19 because he had been awarded $28,000 of his mother's $40,000 life insurance policy.   On April 6, 2018, he made a written request on an I-25 form to withdraw $18,000 from his account, and requested that the funds be paid to David L. Phillips, a friend outside TDCJ. Waddleton states that he directed his requests through the unit's administrative channels to Warden LaCox and later to LaCox's successor, Warden Hutto.   In addition to his request for $18,000 on April 6, 2018, Waddleton submitted "multiple requests that ranged in value from $18k through $495.00" between April 6, 2018, and June 11, 2019 (Dkt. 28, at 3). He states that, with the exception of two $2,000 withdrawals for which Hutto granted permission, all of the requests were denied.   *See id*. at 2-4; Dkt. 1, at 6-10; Dkt. 1-1, at 3-4.

---

[1]    The Office of the Attorney General represents all Defendants except Galvan, who has separated from TDCJ (Dkt. 39). However, its motion to dismiss seeks dismissal of all of Plaintiff's claims.

Waddleton claims that the denials were unjustified and that officials failed to provide an adequate explanation.   He presents his inquiries about the denied withdrawals, along with the official responses providing reasons such as "excess amount" for the denials.[2]   He alleges that officials at the Estelle Unit failed to follow a policy (AD-14.62) that "carefully outlines reasons" that can support a denial of an inmate's withdrawal request; that the officials used conflicting TDCJ rules and policies "as leverage to deny the Plaintiff's withdrawal without reasons"; and that officials "harassed" him with "holds" and "blocks" that prevented him from accessing his funds (Dkt. 28, at 5, 7).

With his original complaint, Waddleton presents Grievance No. 2018133035, in which he complained about the denied $18,000 withdrawal.   On May 24, 2018, at Step 1 of the grievance process, Waddleton complained that Warden LaCox had denied his request to withdraw $18,000, stating that LaCox had verbally informed him on May 11,

---

[2]     *See*, *e.g.*, Dkt. 1-1, at 8-9 (letter to Inmate Trust Fund Department with response dated May 1, 2018, that lists several reasons why his I-25 form had not been processed); *id*. at 10-11 (I-60 request dated April 23, 2018, with response stating that large withdrawals require approval and thus take more time); *id*.at 47 (initialed note dated July 25, 2018, states that an unspecified request was "denied due to the amount"); *id*. at 51 (letter from warden's secretary to Waddleton on July 31, 2018, states that a $9,000 withdrawal form had been returned to him due to "excess amount"); *id*. at 52 (I-60 inquiry regarding withdrawals was answered by Pegoda on July 31, 2018, stating that all I-25s must be approved by the warden and the trust-fund department); *id*. at 53 (I-60 inquiry regarding withdrawals was answered by Pegoda on August. 7, 2018, citing page 66 of the handbook and stating "the agency may decide what funds shall be deposited, what funds may be withdrawn, and to whom these funds may be paid"); *id*. at 61 (letter from Inmate Trust Fund department dated September 7, 2018, informs Waddleton that his account "may contain excess funds" but that "[t]here are no restrictions or limits" on the amount in his account, and further states, "If you have an account at a bank or other financial institution, we encourage you to consider sending your excess funds to this outside account where you can earn interest").

2018, that his request was denied "because Mr. Phillips wasn't family" (Dkt. 1-1, at 13).

Waddleton claimed that LaCox had violated his constitutional rights and the TDCJ

Offender Handbook, which states that inmate funds will be disbursed solely at the inmate's

request. On June 27, 2018, Warden G. Vaughn denied the grievance with the following

response:

> Your claims noted.   According to policy, the Warden has authorization to
> deny a withdrawal from your account if it poses a security violation.
> Warden La[C]ox interviewed you and the recipient, due to conflicting
> reasons for the transaction, the withdrawal was denied.   No further action
> warranted.

(*id*. at 14).   Waddleton then appealed to Step 2 of the process, complaining that LaCox had

verbally based the denial on family relations, not on security, and that there was no security

threat.   Waddleton also cited again to the handbook and complained that LaCox should

not be able to prevent him from exercising his rights.   The assistant regional director

denied his appeal, stating that he had been appropriately advised at Step 1 (*id*. at 44-45).

In addition to his allegations about denied withdrawal requests, Waddleton claims

that officials made improper withdrawals from his inmate account.   In particular, he

claims that officials withdrew $10,108.23 on November 14, 2018, and $7,607.50 on

December 7, 2018 (Dkt. 28, at 5). However, he states that, after he went on a hunger strike,

Hutto gave him written notice that his funds "were not taken, but placed on hold" and that,

although his commissary receipt reflected a $0 balance on his account, the funds

"apparently actually never left [his] account" (*id*. at 6).   Waddleton complained to the

4/23

Office of the Inspector General and in early 2019, shortly after officials notified him they would not investigate the issue, the funds were restored to his account (*id*. at 6-7).

Waddleton states that that the denied withdrawals from his inmate trust-fund account prevented him hiring an attorney to represent him in a probate case that he filed against his great-uncle and step-sister.   He provides information regarding Case No. 201892254 and Case No. 201923116, both captioned *Waddleton v. Waddleton* and filed in the 234th District Court of Harris County (*id*. at 10; Dkt. 45, at 13-14).   He acknowledges that he could have proceeded *pro se* but states that he needed an attorney to effectively present his claims.   *See* Dkt. 28, at 10-11 (explaining that his claim to his family estate was in jeopardy and that he wanted to hire a private investigator because he "strongly believes he has a child on the outside world that he has never met").[3]

Waddleton claims in this lawsuit that Defendants LaCox and Hutto violated his due-process rights by denying him access to and otherwise mishandling the funds in his inmate trust-fund account.   He alleges that Defendant Collier failed to provide an adequate system to address the mishandling of funds.   Additionally, he claims that Tyler

---

[3]     Publicly available online records from Harris County reflect that Waddleton filed *Waddleton v. Waddleton*, Case No. 201892254, on November 5, 2018.   He then filed a new suit, *Waddleton v. Waddleton*, Case No. 201923116 on April 1, 2019.   On November 8, 2019, the court dismissed his 2019 case because his 2018 case was open.   On July 2, 2021, after a warning to Waddleton that his case could be dismissed, the court dismissed the 2018 case for want of prosecution.   *See* Record Search, Harris County District Clerk, available at https://www.hcdistrictclerk.com/Edocs/Public/search.aspx (last visited January 25, 2022) (records accessible by searching for Case No. 201892254 & Case No. 201923116).

and Pegoda mishandled his mail and interfered with his access to the law library, and that
Tyler, Pegoda, Hutto, and Galvan retaliated against him. *See id*. at 17-18.  He sues
Defendants in their official and individual capacities, seeking both damages and injunctive
relief.

Defendants move to dismiss all claims with prejudice arguing that Waddleton lacks
standing and fails to state a claim upon which relief can be granted.

## II.    LEGAL STANDARDS

### A.    Standing

Article III, Section 2 of the Constitution limits the jurisdiction of federal courts to
"cases" or "controversies." *See Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 71
(2013). The requirement that a litigant must have standing to invoke the power of a federal
court is "one of the controlling elements in the definition of a case or controversy under
Article III." *Hein v. Freedom from Religion Found., Inc.,* 551 U.S. 587, 598 (2007)
(cleaned up).   Because jurisdiction is a threshold issue, a court has an obligation to
examine its own jurisdiction.   *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019).   To establish
Article III standing, an injury must be (1) "concrete, particularized, and actual or
imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a
favorable ruling."   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal
quotation marks omitted); *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).
"At the pleading stage, general factual allegations of injury resulting from the defendant's

conduct may suffice to establish standing." *Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019) (cleaned up).

### B.      Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Smith v. Regional Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (quoting *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005)).   A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction.   *Venable v. La. Workers' Comp. Corp.*, 740 F.3d 937, 941 (5th Cir. 2013).   The Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *In re Mirant Corp*, 675 F.3d 530, 533 (5th Cir. 2012).

### C.      Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) may be granted if the pleading "fail[s] to state a claim upon which relief can be granted."   FED. R. CIV. P. 12(b)(6).   In considering a Rule 12(b)(6) motion, courts generally must accept the factual allegations contained in the complaint as true.   *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).    Federal pleading rules require "only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting FED. R. CIV. P. 8(a)(2)). The complaint must,

however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *see Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). The pleadings also must claim that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

The court's review is limited to "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). *See Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289, 294 (5th Cir. 2008) (on a Rule 12(b)(6) motion, documents attached to the briefing may be considered by the court if the documents are sufficiently referenced in the complaint and no party questions their authenticity (citing 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004))). The court also may consider matters of which a court may take judicial notice under Federal Rule of Evidence 201. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

### D. *Pro se* Pleadings and the PLRA

"Pleadings must be construed so as to do justice." FED. R. CIV. P. 8(e). A pleading filed by a *pro se* litigant must be "liberally construed," even if "inartfully pleaded," and "must be held to less stringent standards than formal pleadings drafted by

lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted); *accord Alexander v. Wells Fargo Bank, N.A.*, 867 F.3d 593, 601 & n.36 (5th Cir. 2017) (declining to strictly construe *pro se* litigant's pleadings in context of motion to dismiss).   Even under this lenient standard a *pro se* plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

Because the plaintiff is an inmate bringing suit about prison conditions, the court is required by the Prison Litigation Reform Act to scrutinize the claims and dismiss the complaint at any time, in whole or in part, if it determines that the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.   28 U.S.C. § 1915A(b); 28 U.S.C. § 1915(e)(2)(B); *see* 42 U.S.C. § 1997e(c)(1).   A dismissal under 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim is governed by the same standard under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013)

## III.   <u>ANALYSIS</u>

Waddleton brings claims against six Defendants alleging (1) violations of his right to due process of law, (2) denial of his right to access the courts, and (3) retaliation. Section

9/23

1983, 42 U.S.C. § 1983, provides a vehicle for a claim against a person "acting under color of state law," such as a state official, for a constitutional violation. *See Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 180 (5th Cir. 2016); *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002). Defendants move to dismiss all claims on the grounds that Waddleton lacks standing and fails to state a claim on which relief can be granted. The Court addresses each claim in turn.

### A.    Due Process

Waddleton alleges that LaCox and Hutto violated his due-process rights in connection with his property, in particular, his money in his inmate trust-fund account. He also alleges that Collier, although not personally involved in the alleged violation of Waddleton's rights, failed to provide an adequate system to address the issue.

In the prison context, officials may impose reasonable restrictions on the type and amount of personal property that inmates possess. *Rochon v. La. State Penitentiary Inmate Acc*t., 880 F.2d 845, 846 (5th Cir. 1989); *McRae v. Hankins*, 720 F.2d 863, 869 (5th Cir.1983), *abrogated on other grounds*, *Hudson v. Palmer*, 468 U.S. 517, 531-33 (1984); *see Rosin v. Thaler,* 417 F. App'x 432, 434 (5th Cir. 2011) (recognizing property interest in inmate accounts). To the extent that Texas prisoners have a right to possess personal belongings, the deprivation of property implicates the Constitution only if such deprivation is accomplished without due process. *See Parratt v. Taylor,* 451 U.S. 527, 537 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986).

Due-process requirements for deprivations caused by state officials' authorized conduct are different from those caused by officials' unauthorized conduct. When a deprivation is authorized by an official policy, an inmate must be afforded some combination of notice prior to the deprivation and an opportunity to be heard. *See Zinermon v. Burch,* 494 U.S. 113, 127-28 (1990); *Stotter v. Univ. of Tex. San Antonio*, 508 F.3d 812, 821-22 (5th Cir. 2007). However, when officials engage in random and unauthorized conduct depriving an inmate of property, the deprivation is not foreseeable by the State and pre-deprivation process is impractical. For unauthorized deprivations, therefore, the State can satisfy due-process requirements by making available a meaningful post-deprivation tort remedy. *Zinermon*, 494 U.S. at 128-29; *see Parratt*, 451 U.S. at 541 (prison officials' negligent loss of an inmate's property was properly remedied by post-deprivation procedures); *Hudson*, 468 U.S. at 533 (state official's unauthorized and malicious destruction of the inmate's property was properly remedied by post-deprivation procedure). Texas provides a post-deprivation remedy for inmates whose property has been taken in an unauthorized manner. TEX. GOV'T CODE §§ 501.007, 501.008; *see Myers v. Klevenhagen*, 97 F.3d 91, 95 (5th Cir. 1996); *Spurlock v. Schroedter*, 88 S.W.3d 733, 737 (Tex. App.–Corpus Christi 2002, no pet.).

### 1. Denied withdrawals

In this case, Waddleton alleges that LaCox and Hutto improperly denied his requests to withdraw funds from his trust-fund account, including a large withdrawal

request for $18,000.[4]   To the extent Waddleton alleges that LaCox or Hutto took unauthorized actions when they denied his withdrawal requests, his remedy for the unauthorized withdrawal would be a tort action in state court, not a federal due-process claim.   *See Zinermon*, 494 U.S. at 128-29; TEX. GOV'T CODE §§ 501.007, 501.008.   To the extent Waddleton alleges that LaCox or Hutto's actions were authorized by an official policy that permitted the denial of access to his funds, due-process protections would apply.[5]

As stated above, for authorized deprivations of property, due process requires that Waddleton be afforded notice and an opportunity to be heard.   *See Zinermon*, 494 U.S. at 127-28 (collecting cases).   Waddleton asserts that he was not given reasons for the denied withdrawal (Dkt. 28, at 4-5).   However, he presents the records from Grievance 2018133035 in which he complained about his denied request for the $18,000 withdrawal.[6] Officials responded to his grievance and explained that the withdrawal had been denied on

---

[4]     *See* Dkt. 28, at 17 (alleging that LaCox failed to allow him to withdraw funds); *id*. at 18 (alleging that Hutto failed to allow him to withdraw funds); Dkt. 45, at 3 (alleging that LaCox and Hutto denied him his right to withdraw funds); *id*. at 12 (seeking order enjoining Hutto and LaCox from denying withdrawal requests).

[5]     Defendants argue that Waddleton's due-process rights were not violated because no funds were withdrawn from his account.   However, the Court will assume, for purposes of this opinion, that Waddleton has adequately alleged a "deprivation" of his property rights because he claims that he was deprived of the use of his funds to hire an attorney for his probate case.   *See Rosin,* 417 F. App'x at 434.

[6]     The Court may consider this document when deciding the motion to dismiss because it was attached to Waddleton's complaint.   *See Lone Star Fund*, 594 F.3d at 387.

security grounds, additionally referring to Waddleton's pre-denial interview with the warden (Dkt. 1-1, at 14).   Waddleton then appealed to Step 2, contesting the security rationale and citing to the handbook, but his appeal was denied (*id*. at 44-45).   Although Waddleton did not prevail in the grievance process, his grievance records demonstrate that officials provided him with notice and an opportunity to be heard. *See Geiger*, 404 F.3d at 374 (inmate does not have protected interest in having grievances resolved to his satisfaction); *Evans v. Baker*, 442 F. App'x 108, 110 (5th Cir. 2011) (inmate "received the due process protections required when he received notice of the basis for the confiscation of the subject property and a fair opportunity to rebut the allegations concerning his ownership of the property at the [disciplinary] hearing and in his grievances"); *Allen v. Thomas*, No. H-02-3132, 2005 WL 2076033, at *9 (S.D. Tex. Aug. 26, 2005) (despite "the lack of a formal hearing," inmate "was afforded ample notice and sufficient opportunity to object to the confiscation of his property" because he "complained informally to [an official] in person and formally by pursuing the two-step prison grievance process"); TEX. GOV'T CODE 501.008(a) (grievance system provides "exclusive administrative remedy" for an inmate's claim against prison officials that arises during incarceration).[7]

---

[7]     Waddleton cites to *Siggers-El v Barlow*, 433 F. Supp. 2d 811 (E.D. Mich. 2006), as support for his property claim.   *Siggers-El* has similar background facts regarding prison officials' decision to deny withdrawals from an inmate's account.   However, because Siggers-El brought only a retaliation claim, not a due-process claim, it is not relevant to the analysis above.   Waddleton's retaliation claims are discussed below.

Because any due-process requirements that apply to the denied withdrawals were satisfied, Waddleton's claim will be dismissed.

### 2.   Improper withdrawals

Waddleton also alleges that officials made improper withdrawals from his account, or placed holds on his funds, in the amounts of $10,108.23 and $7,607.50 in November and December 2018.   He acknowledges, however, that the funds were restored in January or February of 2019 (Dkt. 28, at 5-6).   Because Waddleton does not attribute the allegedly improper withdrawal to the action or inaction of any Defendant, the Court cannot redress his alleged injury by directing an order towards any Defendant in this suit. Additionally, because Waddleton states that his funds actually were not withdrawn but rather placed on hold and then restored, he fails to plead any concrete injury.   *See Clapper*, 568 U.S. at 409; *Lujan*, 504 U.S. 560-61; *Smith v Marvin,* 846 F. App'x 259, 261-62 (5th Cir. 2021). Waddleton has not pleaded sufficient facts that could show his standing to bring the claim, *see Stallworth*, 936 F.3d at 230, and his claim will be dismissed.

### 3.   Claim against Collier

Waddleton alleges that Collier, the executive director of TDCJ, violated his due-process rights because Collier failed to provide an adequate system for appealing the unconstitutional deprivation of his property rights.   Dkt. 45, at 2-3 (alleging that Collier is responsible for "ill-written" policies regarding disbursement of inmate funds); *id*. at 11 (seeking order from court enjoining Collier to change handbook to clearly permit

14/23

withdrawal of funds from inmate accounts). Because this claim is dependent on his due-process claims against LaCox and Hutto, which have been dismissed, it must fail for the reasons stated above. Additionally, to the extent Waddleton claims that the grievance process itself violate his due-process rights, he fails to state a claim upon which relief can be granted. *See Geiger*, 404 F.3d at 374.

### C.    Access to Courts

Waddleton's pleadings could be construed to allege that Tyler and Pegoda violated his First Amendment right to access the courts. Defendants move to dismiss the claim.

Prisoners have a constitutional right to access the courts. *Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817 (1977); *Wells v. Thaler*, 460 F. App'x 303, 308 (5th Cir. 2012). The constitutional right is generally afforded by the First Amendment, the Due Process Clause, and the Equal Protection Clause. *See Christopher v. Harbury,* 536 U.S. 403, 415 & n. 12 (2002) (collecting cases that demonstrate the "unsettled . . . basis of the constitutional right of access to courts"). However, a prisoner's right of access is not unlimited, and the Supreme Court has not held that prisoners have a freestanding right to a law library or legal assistance. *See Lewis*, 518 U.S. at 351; *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999); *see Wells*, 460 F. App'x at 308. The Constitution does not guarantee inmates "the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis,* 518 U.S. at 355. Rather, the constitutional right to access a prison law library encompasses

only "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [an inmate's] convictions or conditions of confinement." *Id.* at 356; *Jones*, 188 F.3d at 325. Therefore, an access-to-courts claim is not cognizable unless the inmate can show an "actual injury," in other words, that the inmate's nonfrivolous legal claim had been frustrated or was being impeded by the defendants. *Lewis*, 518 U.S. at 352-53; *see Wells*, 460 F. App'x at 308.

In this case, Waddleton's access-to-courts claims fail because he identifies no actual injury resulting from Tyler's or Pegoda's conduct. Regarding Tyler, the mailroom supervisor, Waddleton alleges that she interfered with his mail in May 2018 and that she made excuses for delayed or failed deliveries.[8] However, he also states that all of the mail in question was eventually delivered to him, with the exception of 80 pictures and a J-pay letter from Phillips that contained an account number. *See* Dkt. 28, at 9. His allegations are insufficient to state an access-to-courts claim because they fail to allege that any nonfrivolous legal claim was frustrated or impeded by Tyler. *See Lewis*, 518 U.S. at 352-53; *see Wells*, 460 F. App'x at 308.

---

[8]    *See* Dkt. 28, at 8-9 (alleging that Tyler "aid[ed] in collective harassment" of Waddleton by doing "numerous things" such as "hold[ing] Plaintiff's incoming mail for several days . . . to purposely consume Plaintiff's reply time back to courts," making false claims that she had attempted to deliver the mail to Plaintiff, or passing his mail to another department for inspection "resulting in increased chances of the Plaintiff's mail becoming lost/stolen"); Dkt. 45, at 8 (alleging that Tyler received Waddleton's mail but merely passed the mail to Pegoda without notifying Waddleton that the mail had been detained, as policy required).

16/23

Regarding Pegoda, the law library supervisor, Waddleton alleges that she harassed him by sending his requested legal materials "late, or not at all," thus interfering with his state court litigation regarding his mother's estate (Dkt. 28, at 11). He also alleges that Pegoda instructed her staff to deny Waddleton access to courts by failing to deliver legal materials when Waddleton was confined to his cell, or by sending materials that were different from the ones Waddleton requested (Dkt. 45, at 6-7).   He claims that Pegoda caused him mental anguish, stress, and loss of sleep, and that he "very likely" lost half of his mother's estate and belongings (Dkt. 28, at 11).   However, he makes no specific allegation that Pegoda was responsible for frustrating or impeding a particular legal claim, much less that the claim was nonfrivolous, and otherwise alleges no specific injury caused by Pegoda that is relevant to his right to access the courts.   In fact, Waddleton states that he "cannot admit to being completely denied access to courts because there is always a [*pro se*] avenue" (*id*.).   He therefore fails to show any access-to-courts injury caused by Pegoda.   *See Lewis*, 518 U.S. at 352-53; *see Wells*, 460 F. App'x at 308.

Waddleton's access-to-courts claim will be dismissed.

## D.    Retaliation

Waddleton alleges that officials at the Estelle Unit retaliated against him by delaying his mail and bringing three bogus disciplinary cases against him.   To state a valid claim for retaliation, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a

retaliatory adverse act, and (4) causation.   *Baughman v. Hickman*, 935 F.3d 302, 312 (5th Cir. 2019).   If an inmate is unable to point to a specific constitutional right that has been violated, the claim will fail. *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).   To show intent, the inmate must allege more than his personal belief that he is the victim of retaliation.   *See Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).   The inmate must produce direct evidence of motivation, or allege a chronology of events from which retaliation may plausibly be inferred.   *Woods*, 60 F.3d at 1166.   As for causation, a successful claim of retaliation requires a showing that "but for" some retaliatory motive, the complained-of adverse action would not have occurred.   *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Woods*, 60 F.3d at 1166.

First, Waddleton alleges that officials retaliated against him when they harassed him in connection with his mail.   In particular, he states that he never received 80 photographs that Phillips sent him in May 2018 (Dkt. 28, at 8).   When asked by the Court which Defendants were responsible for interference with his mail, he stated that Tyler, as the mailroom supervisor, delayed his mail beyond the period permitted by policy, falsely claimed to have made attempts to deliver his mail, or passed his mail to another department in order to delay delivery (*id*.).   He also appears to allege that Pegoda interfered with his mail delivery (*id*. at 11; Dkt. 45, at 6-7). However, he does not sufficiently allege that either Tyler or Pegoda intended to retaliate against him for his exercise of a specific constitutional right, as the law requires. *See Baughman*, 935 F.3d at 312; *Woods*, 60 F.3d at

18/23

1166.   He also fails to allege facts that could show that, "but for" a retaliatory motive of Tyler or Pegoda, the 80 photos would have been delivered.   *See Baughman*, 935 F.3d at 312; *Woods*, 60 F.3d at 1166.   Therefore, his retaliation claim regarding mail interference must be dismissed.

Next, Waddleton alleges that officials brought three disciplinary cases in order to retaliate against him for complaining about his denied access to his funds.   In the first case, Case No. 20180076891, Waddleton was found guilty of possession of a cell phone (Dkt. 28, at 11-13).   He claims that the verdict was unsupported and states that administrators at the unit use disciplinary cases to retaliate against inmates who complain. *See id*. at 12 (alleging that each grievance or complaint to the Office of the Inspector General that Waddleton filed was perceived by the administration as a "rock being thrown," which "compels" TDCJ personnel "to attack the Plaintiff either by direct command or by loyalty to the warden(s)"). However, he does not allege that LaCox, or any other Defendant, was motivated to bring Case No. 20180076891 against him because Waddleton had filed complaints.   In fact, when asked by the Court for specific information about the Defendant or Defendants who brought the case motivated by retaliatory intent, Waddleton failed to answer the Court's questions, instead alleging only that he "believes this is the case that stated the avalanche of harassment/retaliations" because he grieved his case and filed a related habeas corpus petition (*id*. at 13). Waddleton also failed to answer the Court's questions about which Defendant brought the

19/23

case against him, what Waddleton had supposedly done to bring about the retaliation, and why the Defendant was motivated to retaliate against him, among others.   *See* Dkt. 27, at 8 (posing questions).[9]  He therefore fails to state a claim against any Defendant regarding this first case.

The second disciplinary case, Case No. 20190333717, was brought against Waddleton on August 5, 2018, for failure to hand over law library materials (Dkt. 28, at 13).   After a hearing, Waddleton was found not guilty because he had never received the legal material in question.   When asked to explain the connection between this case and any defendant in this action, Waddleton did not provide a direct answer, although he stated that the case "stems directly from" Pegoda, that he "strongly believes it was prompted by loyalty to "the warden(s)," and that he "can take the cluster of circumstantial events to see clearer of who, what, when or where, and even how things happen[ed]" (*id*. at 14). When asked for evidence of retaliatory intent, Waddleton stated that before he received the prior disciplinary case in November 2017, he had "multiple trustworthy jobs within the prison" and had "absolutely no problem" with the administration (*id*.).   These allegations are insufficient to state a claim for retaliation.   Waddleton does not allege that any Defendant

---

[9]    Waddleton alleges that the hearing officer told him, off the record, "I've gotta find you guilty [because] [Major Kevin Smith] wrote the case," which is an "exact example of the illustration previously used by the plaintiff of the rocks rolling downhill, and subordinates being compelled to do what [their] superiors command" (*id*. at 13).   However, even assuming this allegation suffices to plead intent for a retaliation claim against Smith or the hearing officer, neither person is named as a defendant in this action.

brought or prompted Case No. 20190333717, and thus fails to allege a retaliatory adverse act by any Defendant.  *See Baughman*, 935 F.3d at 312.   He also fails to allege facts that could prove that, but for retaliatory motive on the part of a Defendant, the case would not have been brought against him.  *See Woods*, 60 F.3d at 1166.   As stated above, his personal belief that retaliation occurred in insufficient.  *See Johnson*, 110 F.3d at 310. He therefore fails to state a claim upon which relief can be granted as to the second case.

In the third disciplinary case, Case No. 20190073525, Waddleton was found guilty of soliciting assistance to violate a TDCJ rule by sending a letter to Phillips regarding money.   Waddleton alleges that Sergeant Galvan wrote the case against him at the direction of Major Smith and Major Rigsby, but does not allege that she intended to retaliate against him for exercising a specific constitutional right.   He also fails to allege that but-for causation as to Galvan, given his allegation that she acted at the direction of other officers (Dkt. 28, at 15-16).   Additionally, even if Waddleton had sufficiently alleged retaliatory intent by Smith or Rigsby, neither is a defendant in this action.[10]   As with the other disciplinary cases, Waddleton fails to allege more than his personal belief that he was the victim of retaliation and fails to plead facts that could show that, but for the

---

[10]     Waddleton also alleges that Smith and Rigsby were acting at the direction of Hutto (Dkt. 28, at 15-16), who is a Defendant. However, he states that Hutto's involvement is apparent only "through circumstantial events and sometimes clues within someone's conversations," and provides no further detail or information about the "events" or "clues" to which he refers (*id*. at 16).   These allegations are insufficient to allege that Hutto acted with retaliatory intent in connection with Case No. 20190073525 or that his retaliatory motive was the "but for" cause for the case being brought against him.

retaliatory intent of Galvan or any Defendant, the disciplinary case would not have been brought against him. *See Woods*, 60 F.3d at 1166; *Johnson*, 110 F.3d at 310.   He therefore fails to state a claim upon which relief can be granted as to the third case.

Defendants' motion to dismiss Waddleton's retaliation claims will be granted.   His claim against Galvan, who has not appeared in this action, also is dismissed for failure to state a claim on which relief can be granted.   *See* FED. R. CIV. P. 12(b)(6); 28 U.S.C. § 1915A(b)(1); 42 U.S.C. § 1997e(c)(1).

## IV.   **CONCLUSION**

For the reasons stated above the Court orders as follows:

1.   Defendants' motion to dismiss (Dkt. 38) is **GRANTED**.   All of Plaintiff's federal claims are **DISMISSED with prejudice**.

2.   Under 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over any state-law claims regarding Waddleton's property.   Plaintiff has the option to pursue this state-court remedy, if appropriate, and is advised that the period of limitations to file any claims in state court is tolled while the claim is pending in federal court and "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."   28 U.S.C. § 1367(d); *see Artis v. District of Columbia*, 138 S. Ct. 594, 605 (2018).

3.   Defendants' motion to seal the last-known address of Yazmin Galvan (Dkt. 39) is **GRANTED**.

22/23

4.     Plaintiff's motion to add supplemental exhibits (Dkt. 47) is **GRANTED**.

5.     All other pending motions are **DENIED as moot**.

SIGNED at Houston, Texas, on January 27, 2022.

Signed on January 27, 2022, at Houston, Texas.

George C. Hanks, Jr
United States District Judge